UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY HAMMOND MURPHY, <br><br> Plaintiff, <br><br> v. <br><br> SPIRIT AIRLINES, INC., <br><br> Defendant. | Civil Action No. 1:23-CV-63 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

### AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Anthony Hammond Murphy ("Murphy" or "Plaintiff") brings this action against Defendant Spirit Airlines, Inc., ("SPIRIT" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

### NATURE AND SUMMARY OF THE ACTION

1.      Murphy is legally blind and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

2.      As a result of his blindness, Murphy relies on screen access software to access digital content, like a text message, an email, or a website.

3.      Defendant is a commercial travel service that offers consumers, *inter alia*, rental cars, hotels, vacation packages, cruises, and even credit cards, in addition to being a commercial air carrier. *See* 42 U.S.C. § 12181(7)(F) ("The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce— . . . travel service[.]")

4.    In order to access, research, or purchase Defendant's travel services, consumers may visit Defendant's booking platform, located at https://spirit.com/ and available for download from the Apple App Store and Google Play (the "Digital Platform").

5.    This action arises from Defendant's failure to make the Digital Platform compatible with screen access software, thereby denying blind individuals,[1] including Murphy, full and equal access to Defendant's travel services.

6.    The fact that Defendant's Digital Platform is inaccessible is unsurprising. In a 2011 study entitled, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, researchers explained, "[w]ith a minority of exceptions, providing accessibility is ignored in favor of faster market entrance for a product or simply because of long-standing assumptions regarding the need for accessibility and the cost of creating accessible products."[2]

7.    This exclusionary approach persists among creators notwithstanding the fact that:

> Nothing about technology makes it inherently accessible or inaccessible. Most of today's technologies are digital, meaning that they are made up of zeros and ones, and there is nothing inherently visual or auditory about zeros and ones. Digital information is not inherently accessible or inaccessible, but the choices made by those developing and implementing technology determine whether a technology will ultimately be accessible or inaccessible. This is particularly true online, given the rapid pace of technological change and introduction of new web-enabled technologies, since online technologies are often obsolete before they are made accessible.[3]

---

[1] Murphy uses the word "blind" to describe individuals who, as a result of a visual impairment, have substantially limited eyesight. This includes individuals who have no vision or who have low vision. *See* James H. Omvig, *Why Use the Word "Blind"?*, Braille Monitor (Jan. 2009), https://nfb.org/sites/default/files/images/nfb/publications/bm/bm09/bm0901/bm090107.htm.

[2] Brian Wentz, Paul T. Jaeger, and Jonathan Lazar, *Retrofitting Accessibility: The Legal Inequality of After-the-Fact Online Access for Persons with Disabilities in the United States*, First Monday, Vol. 16, No. 11 (Nov. 7, 2011), available at https://firstmonday.org/ojs/index.php/fm/article/download/3666/3077.

[3] *Id.*

8.      Murphy files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's travel services, and because "[i]f people with disabilities are to move from being the most disadvantaged population online to equal residents of cyberspace,"[4] we must reject the mentality of retrofitting in favor of a philosophy that emphasizes the design and development of technology that is inclusive of people with disabilities from launch.

9.      Accordingly, Murphy seeks an order requiring that Defendant make its Digital Platform accessible and adopt sufficient policies and practices to ensure blind travelers may fully and equally access Defendant's travel services in the future.

## JURISDICTION AND VENUE

10.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

11.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing its travel services over the internet to Pennsylvania residents, including Murphy. Unlike, for example, a winery that may not be able to sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online travel service open 24-hours a day, 7-days a week, 365-days a year to Pennsylvania residents.[5]

---

[4] *Id.*

[5] *See Gniewkowski v. Lettuce Entertain You Enters.*, No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017), *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator)); *Law School Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F. Supp. 3d 287 (D. Mass. 2017) (exercising personal

12.     These online interactions between Defendant and Pennsylvania residents involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the internet in Pennsylvania.

13.     Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located in Pennsylvania every time a Pennsylvania resident visits the Digital Platform.[6]

14.     Murphy was injured when he attempted to access the Digital Platform from Erie, Pennsylvania, but encountered communication barriers that denied him full and equal access to Defendant's online travel services.

15.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Murphy's claims occurred.

## PARTIES

16.     Murphy is a natural person over the age of 18. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

17.     He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

---

jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc*., 298 F. Supp. 3d 296 (D. Mass. 2018) (same).
[6] A. Benjamin Spencer, *Jurisdiction and the Internet: Returning to Traditional Principles to Analyze Network-Mediated Contacts*, 2006 U. Ill. L. Rev. 71, 95 n.156 (2005), http://illinoislawreview.org/wp-content/ilr-content/articles/2006/1/Spencer.pdf (citations omitted) ("A cookie is a message given by a Web server to a computer's Web browser. The primary purpose is to identify users and prepare customized Web pages for them. A persistent cookie is 'a cookie that is stored on a user's hard drive until it expires . . . or until the user deletes the cookie. Persistent cookies are used to collect identifying information about the user, such as Web surfing behavior or user preferences for a specific Web site.'").

18.     Murphy has advocated for blind individuals his entire life.[7]

19.     The United States District Court for the Western District of Pennsylvania has appointed Murphy as class representative in class actions substantially like this individual action. *Murphy v. Charles Tyrwhitt, Inc.*, No. 1:20-cv-00056, 2020 U.S. Dist. LEXIS 222540, at *9, *34 (W.D. Pa. Nov. 25, 2020), *report and recommendation adopted by* 2021 U.S. Dist. LEXIS 144 (W.D. Pa. Jan. 4, 2021) ("Based on the above, the Court finds that Anthony Hammond Murphy and Blair Douglas [sic] will fairly and adequately represent the class as representative Plaintiffs and that their proposed class counsel will fairly and adequately protect the interests of the class and provide capable legal representation. The adequacy requirement of Rule 23(a) is satisfied."); *Murphy v. Eyebobs, LLC*, No. 1:21-cv-00017, Doc. 49 (W.D. Pa. Feb. 9, 2022); *Murphy v. The Hundreds Is Huge, Inc.*, No. 1:21-cv-204, Doc. 41 (W.D. Pa. Nov. 17, 2022) (same), and *Murphy v. Le Sportsac, Inc.*, No. 1:22-cv-58, Doc. 44 (W.D. Pa. Jan. 24, 2023).

20.     Defendant is a Florida corporation with a principal place of business in Delaware.

21.     Defendant owns, operates, and/or controls its Digital Platform and is responsible for the policies, practices, and procedures concerning the Digital Platform's development and maintenance.

## STANDING UP FOR TITLE III OF THE ADA

22.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled

---

[7] *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.").

population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[8]

23.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[9] and private individuals[10] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[11]

24.    Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[12] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[13]

25.    The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[14]

---

[8] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[9] 42 U.S.C. § 12188(b).
[10] 42 U.S.C. § 12188(a).
[11] Johnson, *supra* note 8.
[12] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[13] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).
[14] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and

26.     Courts recognize this dynamic too.

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[15]

27.     Consistent with these policies, Murphy files this case to ensure Defendant provides full and equal access to consumers with disabilities.

## SUBSTANTIVE ALLEGATIONS

### Defendant's Accessibility Policies and Inaccessible Digital Platform

28.     Two of the most commonly used screen reader auxiliary aids are JAWS from Freedom Scientific (available on Windows computers) and VoiceOver (available on macOS and iOS devices).[16]

29.     "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer

---

fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

[15] *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (Young, J.) (*quoting Iverson v. Braintree Prop. Assocs., L.P*., No. 04-cv-12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008) (Gertner, J.)); *see also Murphy v. Bob Cochran Motors, Inc.*, No. 1:19-cv-00239, 2020 U.S. Dist. LEXIS 139887, at *15-16 (W.D. Pa. Aug. 4, 2020), *adopted by Murphy v. Bob Cochran Motors, Inc*., 2020 U.S. Dist. LEXIS 177593 (W.D. Pa., Sept. 28, 2020) (upholding tester standing in a substantially identical ADA website accessibility case).

[16]     *See Screen Reader User Survey #9 Results,* WebAIM, webaim.org, https://webaim.org/projects/screenreadersurvey9/ (last accessed Feb. 6, 2023).

applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[17]

30.    "VoiceOver is an industry-leading screen reader that tells you exactly what's happening on your device. VoiceOver can now describe people, objects, text, and graphs in greater detail than ever. Auditory descriptions of elements help you easily navigate your screen through a Bluetooth keyboard or simple gestures on a touchscreen or trackpad. And with unique rotor gestures that function like a dial on touchscreens and trackpads, you can make content such as websites a breeze to browse."[18]



31.    Here is an example of another online store's successful use of audio descriptions to communicate its products to screen reader users.[19] The image on the left illustrates what shoppers perceive visually when browsing the online store with an iPhone. To the right



is an image from the online store with the audio description highlighted for that image in green. Although invisible to the eye, screen access software reads this highlighted text aloud in order to describe the image to shoppers who cannot perceive content visually. In this example, when

---

[17] *JAWS*®, Freedom Scientific, https://www.freedomscientific.com/products/software/jaws/ (last accessed Feb. 6, 2023).

[18] *See Accessibility*, Apple, https://www.apple.com/accessibility/vision/ (last accessed Feb. 6, 2023).

[19] *See* Custom Ink, Homepage, https://www.customink.com/ (last accessed Mar. 28, 2019).

shoppers tab to the image file with a screen reader, the online store announces, "One burlap and cotton tote bag with a custom printed architectural company logo." Blind shoppers require audio descriptions, frequently called "alternative text," like this to access digital content fully, equally, and independently.

32.     Unfortunately, because of Defendant's failure to build the Digital Platform in a manner that is compatible with screen access software, Murphy is unable to fully and equally access Defendant's travel services.

33.     As a result of visiting the Digital Platform, and from investigations performed on his behalf, Murphy found that Defendant fails to communicate information about its travel services effectively because screen reader auxiliary aids cannot access important content on the Digital Platform. Click the links at the end of each subparagraph to watch a short video illustrating some of the extant communication barriers on Defendant's Digital Platform. These links, and the following examples, in no way define the entire realm of barriers that deny Murphy fully and equal access to Defendant's travel services.

## Barriers Specific to Spirit Hotels

34.     Defendant denies Murphy and other blind consumers full and equal access to Defendant's hotel research and reservation services. For example:

        (a)     Defendant maintains a 1-to-10 rating system for the hotels at which consumers may book a reservation on Defendant's Digital Platform. Consumers who perceive content visually can see whether a particular hotel has a high or low rating and base their booking decisions on this information. Unfortunately, Defendant fails to provide sufficiently descriptive alternative text describing this important rating information. To this end, although Defendant announces a hotel's rating, like "eight point six," Defendant fails to describe what this numeric

figure represents. As a result, without the benefit of perceiving the other visual cues on the Digital Platform, it is unlikely—or impossible—for Murphy to discern the meaning of this information, thereby denying him the benefit of this important comparison tool. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/v_PpT6SliBo.

(b)     Links and buttons on the Digital Platform are inaccessible. For example, consumers who perceive content visually will likely recognize the Digital Platform's quantity adjustment buttons and understand that by clicking them they will be able to increase or decrease the amount of travelers for which a reservation is sought. Unfortunately, these buttons are unavailable to screen reader users like Murphy. As a result, when Murphy attempts to book a room, he is unable to change the number of children and adults traveling with him. This barrier causes the Digital Platform to show potentially incorrect listings to Plaintiff based on a fixed and invariable quantity of travelers staying in the room, deterring Murphy from reserving a room because he cannot adjust the search tool to fit his personal needs. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/vhWqYLJ5K3M.

(c)     Defendant has insufficient alternative text for images. Alternative text is an audio description of content that is communicated visually. Unfortunately, Defendant fails to include alternative text for much of the content on the Digital Platform, including the images of the hotel rooms that Defendant makes available for booking. Without alternative text, Murphy cannot discern any difference from one hotel room to another, making it impossible for him to make an informed decision when booking a hotel on Defendant's Digital Platform. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/xIXLVa7CFes.

## **Barriers Specific to Spirit Cruises**

35.     Defendant denies Murphy and other blind consumers full and equal access to Defendant's cruise research and reservation services. For example

(a)     Defendant uses visual cues, only, to convey content and other information. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example, when advertising the nightly rates of staterooms available for booking on the Digital Platform, Defendant highlights the lowest available price in blue. Users who perceive content visually will perceive and understand this visual cue and quickly understand which sail date has the cheapest nightly rate. Unfortunately, Defendant does not similarly alert Plaintiff and other blind shoppers when they tab to the lowest nightly rate otherwise marked in blue font, thereby making it more likely that Plaintiff spends more money by booking another cruise date. Having been made aware of this and other access barriers on the Digital Platform, Murphy is deterred from attempting to navigate and attempt to access Defendant's travel services independently. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/sUd1kgj-h0s.

(b)     Defendant fails to include alternative text for much of the content on the Digital Platform, including the images of each cruise ship's rooms and entertainment options, like pools and restaurants. Without alternative text, Murphy cannot discern any difference from one cruise ship to another, making it impossible for him to make an informed decision when booking a cruise on Defendant's Digital Platform. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/iipO_Whfokg.

(c)     Consumers who perceive content visually will notice that many rooms available for booking on the Digital Platform include two prices. One price—a higher price—

appears in strikethrough font. The other—a lower price—does not. Consumers who perceive content visually will understand that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "discount" price. Unfortunately, screen readers cannot differentiate between the meanings of these two fonts so that users can make an informed decision. Instead, Defendant announces two prices for the same room reservation, making it difficult for consumers to determine with certainty what they signify. This unnecessary confusion frustrates Plaintiff's ability to make informed booking decisions and increases the odds he will abandon the reservation process without making a selection at all. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/kiw6NBGnJdM.

(d)     Defendant prevents screen reader users from accessing some primary content. For example, consumers who perceive content visually can locate available rooms based on a "flashing green icon" that Defendant makes available on the Digital Platform. Unfortunately, Defendant does not provide an audio alternative to this "flashing green icon" describing verbally which rooms remain available for booking on a particular cruise for a particular date. This makes it unlikely—or impossible—for Murphy to independently determine which rooms remain available. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/TahC8z_7cJs.

## Barriers Specific to Spirit Car Rentals

36.     Defendant denies Murphy and other blind consumers full and equal access to Defendant's car rental services. For example:

(a)     Links and buttons on the Digital Platform do not describe their purpose. As a result, consumers who have a visual disability cannot determine whether they want to follow a

particular link, making navigation an exercise of trial and error. For example, consumers who perceive content visually will likely recognize the Digital Platform's quantity adjustment buttons and understand that by clicking them they will be able to increase or decrease the number of child safety seats they need. Unfortunately, these buttons are not labeled with sufficiently descriptive alternative text. As a result, when screen readers hover over them, Defendant announces, "button," only. Because this audio description is meaningless without visually perceiving the context in which it appears, Plaintiff and other blind traveler are unlikely (or unable) to use these tools independently. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/ejViATNiCpI?feature=share

(b)     Defendant does not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, Defendant uses icons on the Digital Platform to communicate the number of passengers and amount of luggage that a specific vehicle holds. Unfortunately, Defendant does not included alternative text for these icons, making it impossible for Plaintiff and other blind consumers to independently determine whether a particular reservation meets their needs. Click the following link to view a short video demonstrating this access barrier: https://youtube.com/shorts/j8o4L3-pxgk?feature=share

(c)     Defendant prevents screen reader users from accessing primary content. For example, Defendant allows consumers to sort and filter the many vehicles that it rents, displaying these options in pop-up windows on the Digital Platform. Consumers who perceive content visually can click various buttons in the pop-ups to expedite and improve their booking experience. Unfortunately, Defendant does not alert screen readers to these pop-up windows. Instead, screen

readers remain stuck on the unrelated elements in the Digital Platform's underlying page. As a result, Plaintiff is unlikely (or unable) to access this important navigational tool independently. Click the following links to view short videos demonstrating this access barrier: https://youtube.com/shorts/xe1O6JFtBL4?feature=share                                 and https://youtube.com/shorts/DgmsPL0ybho?feature=share.

### Plaintiff's Injury

37.     The access barriers described above, and others, deny Murphy full and equal access to the Digital Platform today.

38.     These barriers, together with Defendant's insufficient policies and practices, also humiliate and deter Murphy from returning to the Digital Platform, where he cannot help but feel second-class.

39.     Still, Murphy intends to attempt to access the Digital Platform within the next six months to determine if it is accessible and, if so, to potentially explore the travel services that Defendant offers at that time.

### Defendant's Digital Platform Must Comply with the ADA

40.     Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[20] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[21]

---

[20] 42 U.S.C. § 12182(a).
[21] 42 U.S.C. § 12182(b)(2)(A)(iii).

41.     DOJ first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[22]

42.     In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[23]

43.     In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity's "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises.[24]

44.     In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website was inaccessible to some individuals with disabilities.[25]

45.     In a 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed: "[t]he Department [of Justice] first

---

[22] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), https://www.justice.gov/crt/foia/file/666366/download (last accessed Feb. 6, 2023).

[23] Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, No. 99-50891 (5th Cir. June 30, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last accessed Feb. 6, 2023) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[24] Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last accessed Feb. 6, 2023).

[25] *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), https://www.justice.gov/file/163956/download (last accessed Feb. 6, 2023).

articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities."[26]

46.     In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that Title III covers websites and mobile applications.[27]

47.     In 2022, DOJ published "Guidance on Web Accessibility and the ADA," reiterating that DOJ "has consistently taken the position that the ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web."[28]

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

48.     The assertions contained in the previous paragraphs are incorporated by reference.

49.     Murphy is an individual with a "disability." With respect to an individual, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). The ADA defines "major life activities" to include, in relevant part, "seeing[.]" 42 U.S.C. § 12102(2)(A). Because Murphy is blind, he meets Title III's definition of an individual with a disability.

---

[26] *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last accessed Feb. 6, 2023).
[27] *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), *cert. denied* 140 S. Ct. 122 (2019) (No. 18-1539).
[28] Civil Rights Division, Department of Justice, *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022), https://beta.ada.gov/resources/web-guidance/ (last accessed Feb. 6, 2023).

50.     Defendant operates a place of public accommodation under Title III. Title III defines a "public accommodation" as including a "travel service" and/or "other service establishment[.]" 42 U.S.C. § 12181(7)(F). Because Defendant provides travel services to the general public, it meets Title III's definition of a place of public accommodation.

51.     Title III begins with a general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

52.     The statute contains several general prohibitions, including a prohibition against "denying an individual on the basis of a disability 'the opportunity . . . to participate in or benefit from the goods [or] services' of a public accommodation." 42 U.S.C. § 12182(b)(1)(A)(i).

53.     These general prohibitions are supplemented by several specific prohibitions, including an auxiliary aids and services requirement, which requires public accommodations to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

54.     The United States Department of Justice ("DOJ") has issued regulations implementing the ADA, including the auxiliary aid and service requirement.

55.     These regulations define "screen reader software," like what Murphy used to attempt to access the Digital Platform, as being a covered "auxiliary aid and service." 28 C.F.R. § 36.303(b)(2).

56.     The regulations also include an effective communication requirement, which requires public accommodations to "furnish appropriate auxiliary aids and services where

necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1).

57.     DOJ has issued regulatory guidance noting that the duty to provide effective communication with customers is implicit in the duty of a public accommodation to provide auxiliary aids and services. Appx. A to Part 36 - Guidance on Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities.[29]

58.     DOJ also has issued a Technical Assistance Publication, which provides guidance on communicating effectively with individuals who have vision, hearing, or speech disabilities. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 2014).[30] This publication requires the provision of "information technology that is accessible (either independently or through assistive technology such as screen readers)." *Id.*

59.     Defendant has violated Title III's general anti-discrimination mandate and effective communication requirement by failing to ensure the Digital Platform is fully and equally accessible through screen reader auxiliary aids.

60.     This unequal access also humiliates and deters Murphy from attempting to access the Digital Platform, forcing him to wait until Defendant elects to retrofit the Digital Platform to be accessible.

## **PRAYER FOR RELIEF**

WHEREFORE, Murphy requests judgment as follows:

---

[29] This guidance is available at https://www.ecfr.gov/current/title-28/chapter-I/part-36/appendix-Appendix%20A%20to%20Part%2036 (last accessed Feb. 6, 2023).
[30] This guidance is available at http://www.ada.gov/effective-comm.htm (last accessed Feb. 6, 2023).

(A)     A declaratory judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure Murphy could fully, equally, and independently access Defendant's online travels services;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to ensure its travel services are fully, equally, and independently accessible to Murphy, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following policies and practices that will cause Defendant to remain in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully below;

(1)     Within 90 days of the Court's order, Defendant shall complete an accessibility audit of its Digital Platform that will examine the accessibility and usability of the Digital Platform by consumers who are blind.

(2)     Within 180 days of the Court's order, Defendant shall develop a corrective action strategy ("Strategy") based on the audit findings. In addition to the deadlines outlined below, the Strategy shall include dates by which corrective action shall be completed.

(3)     Within 210 days of the Court's order, Defendant shall disseminate the Strategy among its executive-level managers, employees, and contractors, if any, involved in digital development and post it on the Digital Platform.

(4)     Within 90 days of the Court's order, Defendant shall develop a Digital Accessibility Policy Statement that demonstrates its commitment to digital accessibility to blind and other print disabled consumers, as required by the Americans with Disabilities Act. This Policy

Statement shall be posted in the header of each homepage on the Digital Platform within 120 days of the Court's order, and shall disclose that an audit is taking or has taken place and that a Strategy will be disseminated and posted on the Digital Platform within 180 days of the Court's order.

(5)     Within 240 days of the Court's order, Defendant shall develop procedures to implement its Digital Accessibility Policy across the entire Digital Platform. Defendant shall disseminate its Policy and procedures to its executive-level managers, employees, and contractors, if any, involved in digital development.

(6)     Within 12 months of the Court's order, Defendant shall conduct training, instruction and support to ensure that all executive-level managers and employees involved in digital development are aware of and understand the Digital Accessibility Policy, including proper procedures, tools, and techniques to implement the Digital Accessibility Policy effectively and consistently.

(7)     Within 12 months of the Court's order, Defendant shall hire or designate a staff person with responsibility and commensurate authority, to monitor the Digital Accessibility Policy and procedures.

(8)     Within 12 months of the Court's order, Defendant shall develop and institute procedures that require third-party content and plug-ins built into the Digital Platform to provide blind consumers the same programs, benefits and services that they do to individuals without disabilities, except when it is technically unfeasible to do so. Defendant shall effectuate these obligations by, among other things, implementing as part of its Request for Proposal process language that bidders meet the accessibility standards set forth in WCAG 2.1 Level AA for web-based technology and the Americans with Disabilities Act; requiring or encouraging, at Defendant's discretion, as part of any contract with its vendors, provisions in which the vendor

warrants that any technology provided complies with these standards and any applicable current federal disability law.

(9)     Within 18 months, all pages hosted on the Digital Platform that have been published shall be Accessible to blind users. "Accessible" means fully and equally accessible to and independently usable by blind individuals so that blind consumers are able to acquire the same information, engage in the same interactions, and enjoy the same services as sighted consumers, with substantially equivalent ease of use.

(10)     Defendant shall not release for public viewing or use a substantial addition, update, or change to the Digital Platform until it has determined through automated and end-user testing that those proposed additions, updates, or changes are Accessible.

(11)     Defendant shall conduct (a) an automated scan monthly and (b) end-user testing quarterly thereafter to ascertain whether any new posted content is Accessible. Defendant shall notify all employees and contractors, if any, involved in digital development if corrections to the Digital Platform are needed and of reasonable timelines for corrections to be made. Defendant shall note if corrective action has been taken during the next monthly scan and quarterly end-user test.

(12)     Following the date of the Court's order, for each new, renewed, or renegotiated contract with a vendor of third-party content, Defendant shall seek a commitment from the vendor to provide content in a format that is Accessible.

(13)     Defendant shall provide Plaintiff, through his counsel, with a report on the first and second anniversaries of the Court's Order which summarizes the progress Defendant is making in meeting its obligations. Additional communication will occur before and after each

anniversary to address any possible delays or other obstacles encountered with the implementation of the Digital Accessibility Policy.

(C)    Payment of actual, statutory, nominal, and other damages, as the Court deems proper;

(D)    Payment of costs of suit;

(E)    Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment;[31]

(F)    Whatever other relief the Court deems just, equitable and appropriate; and

(G)    An order retaining jurisdiction over this case until Defendant has complied with the Court's orders.

Dated: May 10, 2023

*/s/ Lawrence H. Fisher*

Lawrence H. Fisher
Pa. No. 67667
One Oxford Centre
301 Grant Street, Suite 270
Pittsburgh, PA 15219
Tel. (412) 577-4040
lawfirst@lawrencefisher.com
Tel. (412) 577-4040

Kevin. W. Tucker (He/Him) (PA 312144)

---

[31] *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987); *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, No. 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed Feb. 6, 2023) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).

Kevin J. Abramowicz (He/Him) (PA 320659)
Chandler Steiger (She/Her) (PA 328891)
Stephanie Moore (She/Her) (PA 329447)
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
Tel. (412) 877-5220
Fax. (412) 626-7101
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com